for itself on this case. The case is Intellect Science versus Sony. You may proceed. Mr. Koshinowski? Koshinowski. Koshinowski. Thank you. Good morning, Your Honor. This is an appeal off of a decision by Judge Cohn in the East Michigan. I think that the first thing I'd like to discuss is what did Dr. Howard Lee invent in the 575 patent? Because I think that went to the core of the district court's error in construing the term multitasking and construing the term multitasking in the preamble, which I think were the key decisions in this case, of course, along with the third issue, which I'll address shortly. Dr. Lee did not invent a machine to launch software simultaneously. What he invented was an information processing apparatus that used multiple optical disks. He said flat out in his patent, one of the objects, one of the main things in his patent was to use optical disks, multiple optical disks, with loading and unloading flexibility. There was some apparatus in which a user could use more than one optical disk in a variety of physical configurations to be able to access data or information from those optical disks. Multitasking was mentioned, of course, by Dr. Lee in his patent, in many parts of the patent. But the way in which Dr. Lee meant multitasking, and I think he made very clear in his patent, was that it was the simultaneous control of the data, retrieval and conversion of the data, obtained from the multiple disks. So the invention of Dr. Lee in this case did not have to do with limiting the use of data to launching or executing software programs. It was one use, but it was not so limited. And the District Court made a mistake in construing the term multitasking to require, as one of the simultaneous tasks, to require the launching and or execution of software. I've looked at the multiple uses of the multitasking term, and as you suggest, they're all permissive, capable of, including, but it says it 20, 30 times. When it repeats it so often, and it becomes so central a feature, does that become more mandatory even if you use careful legal terms to try and hedge on the 30 repetitions of multitasking? I don't think he used... To answer your question, of course there is a... It's central, you read it, it's everywhere. How can that not be what is required? Your Honor, I think it's everywhere because Dr. Lee gives one central embodiment, one central idea to how to use the invention. He mentions launching Windows 95 from disks, and his invention wouldn't have the information stored on the hard drive, it would have it launched directly from there. And that's accepted, but that is still an embodiment. He does say, in multiple places, elsewhere, that the multitasking is for information retrieval, from simultaneous information retrieval, and he does give other examples. I agree with your Honor, he does use that example of software launch repeatedly in the patent. I look at the figures too, the figures all show multiple arms accessing the disk at multiple places, multitasking. That's correct. And when you have several disks, you see several of them being asked access at the same time. That's right, and I think... Figures too head us that direction, don't they? Well, the figures certainly show multiple configurations of multiple disks and multiple read heads, which Dr. Lee makes clear that what his invention does is have a simultaneous control over those heads on those disks. And I think that the... For instance, one of the errors that I think the court made, along with the special master, was to look in the prosecution history and say, well, he distinguished over Takagi and used the term multitasking, and that is one of the reasons why the court felt constrained to construe the term in the preamble. Well, if we look at what he did, what Dr. Lee did in the prosecution history, is he distinguished Takagi by pointing and changed his claim by changing the simultaneous processing, by changing the simultaneous receiving of data from a single disk to simultaneous control of two disks. And that's what he termed multitasking. And so he did not, in the prosecution history, use the term multitasking in the way in which the court later construed it, by putting in an extra element of having this apparatus of Dr. Lee's require to launch software. And I think the court was thrown off by the defendant's, I think, unsupported argument that, well, their units are simple audio units, and Dr. Lee's invention was meant for computers. And I think that's a very simplistic analysis and a very simplistic way of presenting the evidence when, in fact, the defendant's, we believe, infringing units were sophisticated devices that had two heads, that had two CDs, and that had to have microprocessor for allowing the reading of data from one CD and the recording on another. Are the Q's devices here even capable of executing software programs simultaneously? We believe, yes, in the record it was. Now, what the defendants latched on to were admissions by trial counsel to request to admit that the accused devices could not launch software like Windows 95. And I think that's very clear. But are they capable of executing software programs simultaneously? Yes, we believe so, and we believe our experts report did point it out as that. Do you have anything in the record that shows them so used? We believe we pointed out the SMPC coding, and I hope I got the acronym right, I pointed out in our brief that all of the CDs would be protected, there's an anti-piracy protection, and that the units were capable of reading that software, using that software. So that is in the record, in the affidavit of Dr. Michelson opposing summary judgment. What the court focused on was the fact that the plaintiff did admit that the accused devices were not capable of launching software such as Windows 95, and that's undisputed. Counsel, while you're on Dr. Michelson's affidavit, the district court granted summary judgment and non-infringement. That's correct. Because there was no basis for a challenge to any of the facts. Where in Dr. Michelson's affidavit does he really point out that the infringing device works the way the patent claims it does, specifically in a high-speed system control bus? Where is it? When does he talk about that? I'm talking about paragraphs 94 and 95 of his submission. Dr. Michelson points to the particular circuit diagrams of each of the accused infringing devices, and these diagrams are excerpts from much larger manuals. Dr. Michelson points out there were only two structural issues identified by the defendant's expert, Kaliski, as allegedly not being in the accused devices. That's the wideband host interface bus in the ITDM. When does he speak to that, that in fact the alleged infringing devices really contain them? I believe, Your Honor, in those three paragraphs that is where we have to go. In those three paragraphs, he points out the particular integrated circuit in each device. But he speaks to the manuals in those two paragraphs, doesn't he? He does. He speaks to the manual. How does he say that specifically there's a question of fact that needs to be raised in conjunction with those particular operations? Well, Your Honor, the particular question of fact that had to be raised in that argument was do these devices have these two structural components? And he says yes. And he says they have the wideband host interface bus and they have ITDM. When does he say that? Well, he does say that in his declaration. When does he say that in paragraphs 94 and 95? He does use a sentence that is perhaps not as grammatical as one would wish. I'm certainly not here to defend his use of the English language. But he does say these structures have them. He points to the particular page of the circuit diagram which shows the interface bus and the ITDM. The intelligent time division multiplexer. And he identifies the ITDM by particular IC integrated circuit number. So if you go to that page, you can see. Well, let's go to that page. Page 2236, which has paragraph 94. 2237, which has paragraph 95. That's right. He points out the service diagrams for each of them in the Sony product. Serial input buses receive information from each optical drive to an ITDM for multiplexing subcode data, which is then transmitted to the host bus interface. ADDA converter IC500 multiplexes audio information stream for output by the unit. But where does he say that the Sony program or the Sony particular product works in the same manner as in the patent? Where does it contain the wideband host interface bus? All I have to go on, Your Honor, is that he points to the page of the circuit diagram which shows the data route from the optical heads through the serial multiplexer and out. So obviously he could have said the data does not get from the read head to the multiplexer wirelessly. It doesn't get there some other way. He said it does get there. It is on this page, and he points out where it ends up in the multiplexer. But in order to defeat the motion for summary judgment, he has to do that with some degree of specificity. Your Honor, I think he does do that with specificity. And on these facts, where the defendant says these structures don't exist, these structures of their equivalents don't exist, the expert can say, yes, they do. They are here. And I think, of course, I wouldn't go further. And they work in a particular manner, and they work in the same manner as required under the claim. Well, I think that he does say that. That would raise the issue of whether or not there's a factual determination at that point which would defeat the summary judgment motion. Well, I think he does say it. He does say it. He says it in, I think, paragraph 103, but that I'm going to go from memory. But the problem here is that there was no real issue as to what the function of these structures were. It was just to transmit the information sets converted by the signal processing system to the host computer. And I think that's relatively simple. And it really wasn't, I think, particularly disputed. I mean, many other points were disputed. This really wasn't. And I think Dr. Michelson may have been a little too cursory. Does he say that in paragraph 102? Yes, I believe that was the paragraph I was searching for. You're into your rebuttal time, Mr. Kocanowski. Do you want to keep it? Your Honor, I think that I will go on the preamble argument on the paper. Thank you, Mr. Kocanowski. Mr. Hutchins? Yes, sir. May it please the Court. Does this patent really require that you run Windows 95 at the same time you're running an audio program or something else? It requires that capability to the user, absolutely, Your Honor. Are any of the accused devices run Windows 95 at the same time they're playing my ABBA songs? Absolutely not, Your Honor. Or Beatles, by the way. It could be either one. If you took a Microsoft Excel disk and put it in one of the accused products, assuming you could hook it up to a computer, you wouldn't be working on your spreadsheet anytime soon. The machine simply does not have the hardware to decode and transmit computer software programs in a usable manner. So we're back to whether they're capable, however, of simultaneously running that, right? If you're including computer software programs, they are absolutely not capable. Can both disks be moving at the same time? Yes, because you can play one song and record it to a blank CD that you've put in the other drive. So Dancing Queen goes in here, you play it, you can record it to this disk. Of course, that's happening simultaneously. But it has nothing to do with computer programs. And, I mean, this is a classic situation of a square peg trying to be fit into a round hole. And so IST is recasting its invention. And in so doing, they're removing that which the patent describes as the most important feature. And it's ad nauseum in the briefs and in the special master's report and recommendation and the judge's opinion. But from the title, which describes multitasking, and by the way, it's not in the brief, but at A399 in the prosecution history, the inventor went out of his way to say the title was clearly indicative of what the inventors intended their invention to be. And really, that's the crux of the issue. You have to look at the patent as a whole and try to determine what is it that the inventor believed their invention to be and intended to encompass it in the claims. And when you have a concept of multitasking, which is explicitly defined as having the requisite hardware sufficient to launch software programs directly from the optical disks as opposed to your hard drive, when you have a patent focused so much on multitasking, it is part and parcel of the invention. But it's always permissive. The language is always capable of multitasking, including multitasking, such as multitasking. It's not ever there must be multitasking in the present invention. Well, two issues. It talks about the capability and that allows the user to do that. That's simply saying, of course, it's up to the user to determine how they use the equipment. But make no mistake, the device has to have the hardware sufficient to allow for that capability. And that's what the claim requires and that's what's missing from the products. The issue of no infringement isn't because there wasn't proof that no one had actually taken a product and used it to run software. Of course, that never happened. But the reason it never happened was because the products fundamentally can't do it. They can't read those types of disks. So when it talks about that it has to allow the user, the permissiveness goes towards what the user, of course, decides what to do when he buys the product. It has nothing to do with whether it's an active requirement of multitasking. It is. It's a requirement of multitasking that you have that capability and therefore allow the user to do that. I will also note, however, there are instances where it's mandatory language is used, such as must or necessary. At column 5 in line 16, it states, in order to simultaneously launch several software programs directly from either an optical disk or multiple optical disks, in accordance with the interest of the present invention, the hardware of an information processing apparatus must possess multitasking capability. That's pretty clear, but that's not all because it's the only primary object. It's described as the main interest. It really was used by the inventor to signal, this is what I think I invented. That's why he spends all the paragraphs talking about computer systems and hard drives and the problems of having to copy your software programs to a hard drive before launching them. That's the problem he's solving and that's what this invention is directed to. And to read it otherwise, to strip that from the claim, as in the language of the Corning Glass Court or the GE Court, would simply be divorced from reality. You're divorcing the claim from the specification. Can you help me with another thing? Multitasking here is a functional, very functional. This is an apparatus claim. What's the structure that you would attach to multitasking? Certainly, Your Honor. The formal definition of multitasking in the patent is actually for hardware. It actually is structural. It's hardware that allows the user to launch or execute, they say execute, the computer software simultaneously from the disks. It necessarily implicates the hardware because the type of data you're transmitting, the type of disk you're using affects the type of decoding and transmission you're going to have. And the proof is in the pudding. The accused products are audio CD products. They don't have that hardware. I mean, you put those disks in, you get an error. It's gibberish. So it is referred to by the counsel in the briefs, et cetera, as a functionality. But it's actually defined as far as the hardware. Again, in much the same way in Corning Glass that an optical waveguide wasn't just a use for the optical fiber. They said, well, no, the invention doesn't indiscriminately deal with all optical fibers. We're talking about waveguides. Here, the invention doesn't indiscriminately deal with all optical disk readers. It deals with a particular problem that's set out at length in the patent. And that's the launch of software. And respectfully, there really was no question of fact that the accused audio players can't perform that, that don't have the hardware sufficient to allow the user to perform that function. Now, I'll also talk about the multitasking, excuse me, the data transmitting means element that was discussed. And here, there was really no issue with respect to claim construction. And so IST had to show that the accused products had, among other things, Can I just catch on one thing before you go on to that? Yes, Your Honor. Was it found below that the devices can't read software? Well, it wasn't an affirmative finding. The court held that there was no evidence of record that the accused products could, had the hardware that would allow a user to execute computer software programs. And that, setting aside the admission, which you can't, because it is admitted in the response to Sony's undisputed facts that that type of computer software is not used. Even setting that aside, respectfully, we disagree about the sufficiency of Dr. Michelson's statements in that regard as well. I think when, to the extent that they have an argument that it reads, or the accused products read software, that's really a claim, that's really their same argument on, it's actually not a limitation that you be able to read computer software. The patent makes crystal clear when they're talking about the computer software, what they're talking about. So, again, there was an admission, even absent that there wasn't sufficient evidence otherwise. So the court and the special masters and the court's finding in that respect as to a lack of evidence is certainly supported by the record we submit. Why don't you explain what data transmission means? I'd like to, Your Honor. We talked about an ITDM and a wideband host interface bus. Those were agreed, both parties agree, are two of the corresponding structures in the patent. The declaration of Dr. Michelson is verbatim the relevant portions in our brief at pages 36 and 37. This is a classic instance where Dr. Michelson provides a conclusion that there's an ITDM, and he says a host bus interface, he doesn't even allege a wideband. Interface bus, is that a complicated element, or is that a wire? Depending upon the use to which it's put, it could be a wire, it could be much, much more complicated. Keep in mind, when the patent talks about a wideband host bus interface, the patent is simultaneously regularly distinguishing prior art, including audio CDs, as simply not talking about what they call the high-speed, high-efficient reproduction. You understand the point of my question. My question is, doesn't one of skill in the art, even reading Dr. Michelson's shorthand, understand what he's saying? No. With respect, no. And there's no indication that one would be able to readily find a host bus interface for transmitting data to a host computer in these audio CD players. That was Dr. Michelson's job. Again, setting aside he doesn't even allege that it's a wideband interface, or that there would even be a need in an audio player for such wide bandwidth, given that those types of audio players are distinguished in the patent as not being directed to the same type of data transmission that the patent is talking about. Well, does he identify the specific structures that would need to be in the accused device to cover the four data transmission means? No, Your Honor. Where is it lacking? Certainly. In the sentence that he mentions in ITDM, which is just short for Intelligent Time Division Multiplexer, he writes, Serial input buses receive information from each optical drive to an ITDM for multiplexing subcode data, which is then transmitted to the host bus interface. Now that sentence is a bare conclusion. It identifies no structure in the accused devices at all. It does say there's an ITDM, and he does allege that it's multiplexing some subcode data, which is not the, in a CD, the music that you listen to is not subcode data. It's the audio data. Where are you reading from? I'm just telling you that. But I'm reading from the third sentence. I'm providing more information than did Dr. Michelson. You testify. Dr. Michelson didn't even bother explaining to you what subcode data is or isn't different than audio data. That was my elaboration. In the following sentence, he identifies a particular chip, an IC500. He writes, Analog to digital and digital to analog converter IC500 multiplexes audio information stream for output by the unit. Now, on its face, he doesn't say IC500 is an ITDM. He doesn't say ITDM IC500. He calls it a D-to-A converter, and they're different. But you don't have to take my word for it. Even the patent itself, if you were to look at Figure 7 of the patent, which is A2283, it shows, because there's a possibility you can have an audio disc playing while you're launching your software, it shows at the top there's a shunt that goes to a digital-to-analog converter out to an audio amplifier. And the accused products do hook up to an audio amplifier. That's not disputed. That's Block 710. That is multiplexed in that you have multiple input lines going out to the same audio amp. But it has nothing whatsoever to do with the ITDM. Just a box. The ITDM's a box. The ITDM is here, and it's showing the data going to the host computer. Here's a digital-to-analog converter for playing music. They're not the same. And you cannot read Dr. Michelson's statement, either on its own or even if you were to try to use the patent, to say when he says there's a digital-to-analog converter, IC500, that multiplexes the music for output by the unit, he's saying that's an ITDM, and that it sends the music to a host bus interface. He just doesn't say it. And even if he made that allegation, which he doesn't, I think IC500 is an ITDM, that would simply raise his declaration to the unsatisfactory level of the Arthur Collins declaration, which said the claimed TST switch in the accused product is a JNET switch. But he provided no explanation, factually, of the operation of the devices that would allow one to even judge whether he was full of nonsense or not, and it was raising a genuine issue of fact. Similarly, I see I'm almost out of time. Similarly, there was a reference to paragraph 102 as to how these operate to achieve the identical function. Paragraph 102 is a mere conclusion. So with that, thank you, Your Honor. Thank you, Mr. Hutchins. Mr. Kocanowski. Mr. Kocanowski, your patent talks all the way through about running Windows 95 at the same time you're doing other things. These machines play my ABBA and Beatles. How do they run Windows 95? Obviously, they do not run Windows 95, and I do take issue at the risk of standing here before you to disagree that the patent does not say that it runs Windows 95 throughout. It is an example that Dr. Lee uses. But that's where your invention was really going. It was a way not adopted by the hardware world, right, to run multiple disks at one time? We didn't ever really adopt that. But that's what your invention was. Certainly, I think one of the uses he envisioned was that the industry would use a CD in lieu of a hard drive. Yes, exactly. I don't think that there's any question about that. But the claims as written and the specification simply isn't limited to that. And that's where we go into that area of how much do we go into the preferred embodiment and read that into the claims? And I submit that we can't do this in this case. We cannot do this in this case because there are sufficient other ways, as you pointed out to Mr. Hutchins, asking your question, that all of these references are permissive, and even in the definition. Now, either we have the definition that controls, I as the inventor say, I'm my own lexicographer, I say, here it is, or we don't. Here, the district court took the definition and wrote the word allow right out of it and changed it to require. So that is a difference, and that's an error in the case. Thank you, Mr. Kokanowski. Thank you, counsel.